2009 OK CR 31

**Anthony Castillo SANCHEZ, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2006–627.**

Court of Criminal Appeals of Oklahoma.

Dec. 14, 2009.

---

8. 12 O.S.2001 § 140.

An Appeal from the District Court of Cleveland County; the Honorable William C. Hetherington, District Judge.

Silas R. Lyman, Diane Box, Matthew Haire, Norman, OK, attorneys for defendant at trial.

Tim D. Kuykendall, District Attorney, R. Richard Sitzman, Asst. District Attorney, Norman, OK, attorneys for the State at trial.

Michael D. Morehead, Janet Chesley, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General, Jennifer Strickland, Asst. Attorney General,

Oklahoma City, OK, attorneys for appellee on appeal.

### OPINION

LEWIS, Judge.

¶1 Anthony Castillo Sanchez, Appellant, was tried by jury and found guilty of Count 1, murder in the first degree, in violation of 21 O.S.Supp.1996, § 701.7(A); Count 2, rape in the first degree, in violation of 21 O.S.1991, § 1114(A)(3); and Count 3, forcible sodomy, in violation of 21 O.S.Supp.1992, § 888(B)(3), in Cleveland County District Court, Case No. CF–2000–325.[1] The State alleged the murder involved three statutory aggravating circumstances: The murder was especially heinous, atrocious, or cruel; the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(4), (5), and (7). The jury found all three aggravating circumstances and sentenced Appellant to death for murder in the first degree, forty (40) years imprisonment and a $10,000 fine for rape in the first degree, and twenty (20) years imprisonment and a $10,000 fine for forcible sodomy. The Honorable William C. Hetherington, District Judge, presided over the trial and pronounced the judgment and sentence on June 6, 2006. This Court stayed execution of the judgment and sentence on June 14, 2006. Mr. Sanchez appeals.

### FACTS

¶2 Jewell Jean "Juli" Busken lived in the Dublin West Apartments on East Lindsey Street in Norman, near the University of Oklahoma, where she studied ballet. In the winter of 1996, she had completed her course requirements for graduation. Ms. Busken planned to return to her parent's home in Arkansas and enroll in graduate school. She had packed most of her belongings earlier in the week. Her parents were to arrive in Norman on December 20, 1996, to collect her things in a U–Haul trailer and accompany her back to Arkansas.

¶3 Ms. Busken spent the evening of December 19, 1996, visiting with her college friends, exchanging Christmas gifts and goodbyes. She had planned to give her friend, Megan Schreck, a ride to Will Rogers Airport early on the morning of December 20, so the two decided to stay up all night long. Ms. Busken and Ms. Schreck left Schreck's apartment on West Lindsey Street and ate at the Kettle around 2:00 a.m., returning to the apartment around 3:00 a.m. Ms. Busken fell asleep for a short while, and they headed toward the airport around 4:30 a.m. Around 5:00 a.m. on December 20, 1996, Ms. Busken dropped off her friend. She left Will Rogers Airport driving her red Eagle Summit, which bore an Arkansas license plate.

¶4 Around 5:30 a.m., back at the Dublin West apartments where Ms. Busken lived, at least three people heard a woman scream in terror. William Alves, a Norman Police officer, lived at the apartments and worked off-duty security. When Alves heard the screaming, he went outside and looked, but saw nothing. Jackie Evans lived across the parking lot from Ms. Busken. She also heard a woman's scream, and a man saying "just shut up and get in the car." Ms. Evans described a car door opening, then closing, the sound of footsteps, and another car door opening and closing. She then heard the car start and quickly drive away. Norman Police officer Kyle Harris arrived at the apartments around 5:51 a.m. in response to a 911 call reporting the screams. He could find nothing suspicious at the apartment.

¶5 Ryan James worked with Juli Busken at the OU Golf Course. They were close friends. Mr. James had plans to meet Ms. Busken for lunch on December 20, 1996. When he arrived at Ms. Busken's apartment around 11:00 a.m., he noticed her car was gone. Mr. James returned to work at the golf course. He checked Ms. Busken's apartment again when he got off work around 4 p.m., hoping they would have dinner together, but she still had not returned home. Mr. James was worried about Ms. Busken and checked with his grandparents

---

1. The State dismissed Count 4, a charge of kidnapping, due to the statute of limitations.

to see if she had called or visited their home, as she often did. She had not been there, either. Mr. James and his grandfather searched for Ms. Busken, even driving to Will Rogers Airport trying to find her. Mr. James' grandfather knew OU Police Chief Joe Lester. They contacted Chief Lester early in the evening of December 20, 1996, to report that Ms. Busken was missing. Juli Busken never returned.

¶ 6 Randy Lankford saw something unusual lying along the shoreline of Lake Stanley Draper around noon on December 20, 1996. He may have persuaded himself it wasn't a human body he had seen, but whatever it was still troubled his mind after he returned home. Lankford returned to the lake with his wife after dark that evening. Shining their lights down onto the shore, the Lankfords believed they saw a body lying at the water's edge. They reported the matter to a nearby police station, and police soon descended on the scene to investigate the body and preserve evidence. From the physical description in a Missing Persons report originating from Norman concerning a female student, Oklahoma City police quickly deduced they had found the body of Juli Busken. Chief Joe Lester gave the awful news to Bud and Mary Busken, who had arrived in Norman just a short time before, that the search for their missing daughter was over. A long search for Juli Busken's killer had only begun.

¶ 7 Ms. Busken's body was clothed when she was found, but her jeans were unbuttoned and unzipped, and her underwear was partially rolled down her thighs. She was found lying face down, her head and shoulders in the shallow freezing water, her hands bound behind her with black shoe laces. Her prized opal and diamond ring, a gift from her parents, was missing from her finger and has never been found. Crime scene technicians recovered a possible pubic hair from her stomach when she was turned over. Investigators could see Ms. Busken had been shot in the head.

¶ 8 At the autopsy, the Medical Examiner observed that Ms. Busken's nose and forehead were scratched and bruised, and blood was in her left nostril. Several oval shaped bruises were seen on her inner thigh. She was also bruised in a small area near the labia, and a small scrape was found in the perianal region. Fecal matter was smeared in an area on her buttocks. The Medical Examiner preserved swabs of her oral, vaginal, and anal cavities for DNA analysis. The death wound was a contact gunshot to the rear of the skull, traversing the brain from back to front, left to right, and slightly upward before coming to rest in the frontal area of the skull, causing multiple fractures and catastrophic brain injury. The Medical Examiner recovered the fatal bullet, later identified by caliber as .22 Long Rifle. Subsequent ballistics analysis showed the barrel of the weapon that fired the fatal bullet marked it with sixteen lands and grooves and a right-hand twist.

¶ 9 Police recovered several items of evidence from the crime scene at Lake Stanley Draper, including a discarded pink leotard bearing the initials "JB," wiped with apparent fecal matter. A tissue smeared with apparent fecal matter was also recovered. Investigators could see two sets of footprints leading to the water's edge, and one set leading away, which they marked and photographed. From multiple cuttings of Ms. Busken's garments, the anal swab obtained from the body, and a pair of pajama bottoms recovered from Ms. Busken's vehicle, criminalists later identified the presence of human spermatozoa. Criminalists eventually used the genetic material recovered from Ms. Busken's panties and the pink "JB" leotard to develop the DNA profile of an unknown suspect.

¶ 10 Sightings of Juli Busken and her abductor reported by other witnesses narrowed the timeframe within which Ms. Busken was kidnapped and killed. Janice Keller saw a small red car like Juli Busken's near Lake Stanley Draper between 6:45 and 7:00 a.m. on the morning of December 20, 1996. Keller saw a young man, she approximated between age twenty-five and thirty, driving the car. In the passenger seat, she could see a woman who seemed somewhat younger, with her hair pulled back and prominent bangs in front. In the young woman's remarkably large eyes and facial expression, Ms. Keller

sensed the presence of fear. She also noticed how the male driver looked angry. Ms. Keller contacted police about her sighting after hearing of the Juli Busken murder, but was not interviewed until two years later. She provided police with her own profile drawing of the man she saw, and helped develop a composite drawing admitted at trial.

¶ 11 David Kill was on his way home from a night shift at Tinker Air Force Base, driving back toward Norman that morning around 7:10 to 7:15 a.m. He encountered a red compact car bearing an Arkansas license plate driving away from Lake Stanley Draper. A male driver, alone in the car, cut off Mr. Kill in traffic and seemed not to notice he was there. Mr. Kill was incensed by the man's driving and chased the car back to Norman at high speed. He testified that despite his aggressive pursuit of the car, the driver still seemed oblivious to him. He parted with the red car when he turned on Alameda Street, but watched it continue south toward Lindsey Street. After seeing a news report about Ms. Busken's disappearance, Mr. Kill realized he had seen her car and called Oklahoma City Police. Kill also gave a physical description of the driver he had seen and helped develop a composite drawing, also admitted as evidence.

¶ 12 Late in the evening of December 20, 1996, OU Police found Juli Busken's red Eagle Summit parked just across the street from the Dublin West Apartments, where the screams were heard early that morning. A pair of pajama bottoms recovered from the car were stained with semen, from which criminalists later isolated a sperm fraction and developed a partial DNA profile. Police also photographed an impression of a person's buttocks imprinted on the exterior panel of the car. A cell phone, a CD player, and a radar detector were missing from the car. Records of activity from Ms. Busken's missing cell phone showed that a call was placed on December 21, 1996, to a number investigators later associated with Appellant's former girlfriend. Calls were also placed from Ms. Busken's phone after her murder to two numbers (both in the form 447–68xx) similar to phone numbers later associated with friends of Appellant.

¶ 13 In 2000, the State of Oklahoma charged an unknown suspect with the kidnapping, sexual assault, and murder of Juli Busken, identifying the defendant only by the DNA profile developed from crime scene evidence. In the months and years after her murder, investigators contacted and interviewed virtually every person they could find who had ever known, or might have had reason or opportunity to harm, Juli Busken. Detectives asked for DNA samples from almost 200 people to compare against the suspect DNA profile and other serology evidence. Throughout the entire investigation, prior to July, 2004, Anthony Castillo Sanchez was never interviewed, contacted, or considered a suspect in Ms. Busken's murder. Indeed, Ms. Busken's closest friends testified at trial they had never seen or heard of Anthony Sanchez as a friend or acquaintance of Juli Busken.

¶ 14 Appellant went to prison in 2002 for a second degree burglary committed the previous year. While serving his sentence, the Oklahoma Department of Corrections obtained his tissue sample for DNA analysis, as required by statute. The Oklahoma State Bureau of Investigation (OSBI) then developed a DNA profile from the sample and placed it into the OSBI's Combined DNA Index System (CODIS). In July, 2004, OSBI Criminalist Ken Neeland notified a cold case detective in the Oklahoma City Police Department that Anthony Sanchez's DNA profile had generated a hit on the unknown DNA profile associated with the Juli Busken murder.

¶ 15 Police obtained a search warrant and a new sample of Appellant's DNA for further comparisons. The State presented evidence at trial that Appellant's DNA matched the DNA profile generated from the sperm cell fraction isolated on Ms. Busken's panties; and also matched the sperm cell fraction isolated from the stained pink leotard discarded at the crime scene. The matches corresponded to Appellant's known DNA at all sixteen genetic loci tested. The State's DNA expert characterized the probability of a random DNA match on the Busken evi-

dence with an unrelated individual other than Appellant as 1 in 200.7 trillion Caucasians, 1 in 20.45 quadrillion African Americans, and 1 in 94.07 trillion Southwest Hispanics. Appellant also could not be excluded as the donor of a DNA mixture isolated from epithelial cell fractions on the panties and leotard. DNA comparisons on the spermatozoa recovered from the anal swab and the pajama bottoms from the car were inconclusive.

¶ 16 Appellant's former girlfriend, Christin Setzer, testified that between 1994 and 1996 she lived with Appellant in a residence on Drake Drive in southeast Norman, about one mile from Juli Busken's apartment. Ms. Setzer and Appellant had a child in May, 1997, but later separated. When police interviewed Ms. Setzer years after the Busken murder, she described an incident when shots were fired within the Drake Drive residence. Only Appellant and his step-father were in the room where shots were fired. Ms. Setzer told police she later saw bullet holes in the east wall of the room. Police obtained a search warrant for the residence in 2004, and dismantled the walls looking for evidence of these shots and any potential projectiles. They located a linear defect in the lumber of a wall stud consistent with a bullet strike, but were unable to find a projectile. Police also found a piece of foam which bore marks consistent with a bullet strike. After police collected these items and left the scene, the owner of the residence vacuumed the area of the wall which police had dismantled. Searching the contents of the vacuum bag later in his garage, he located an item later identified as a .22 Long Rifle projectile. The Drake Drive bullet was marked ballistically with sixteen lands and grooves and a right-hand twist, and thus shared the same caliber and general barrel markings as the .22 bullet that killed Juli Busken. Testimony from one of Appellant's friends established that Appellant was in possession of a small .25 caliber pistol in 1994 and 1995. The State impeached this witness with his prior statement that the pistol could

have been a .22 or .25 caliber. Attempts to positively identify the Drake Drive bullet and the bullet recovered from Juli Busken as being fired from the same weapon proved inconclusive.

¶ 17 Appellant called no witnesses in the first stage of trial and did not testify. We will relate additional facts in connection with individual propositions of error.

## ANALYSIS

¶ 18 In Proposition One, Appellant argues the District Court committed reversible error by trying him before the jury in shackles in violation of 22 O.S.2001, § 15, which provides:

> No person can be compelled in a criminal action to be witness against himself; nor can a person charged with a public offense be subjected before conviction to any more restraint than is necessary for his detention to answer the charge, and *in no event shall he be tried before a jury while in chains or shackles* (emphasis added).

¶ 19 Before trial commenced, the District Court notified Appellant and his counsel that Appellant would be required to wear either a high-voltage shock sleeve or restraints during the trial for "security reasons." Appellant objected, arguing that he had not engaged in any disruptive or threatening conduct warranting restraints. This was not disputed at the outset of trial,[2] yet the Court indicated in discussions with Appellant that it was the desire of his custodians that he be restrained, and the Court intended to accommodate that request.

¶ 20 Defense counsel did not oppose the Court's decision to order the Appellant restrained either by shackles or the shock sleeve. With the District Court resolved to use some form of restraint, counsel attempted to persuade Appellant to wear the invisible (or minimally visible) shock sleeve to prevent an appearance before the jury in irons. Appellant initially declined the

---

2. The record reflects that Appellant engaged in some disruptive conduct when the verdict of guilty was received in open court, by turning and addressing Ms. Busken's parents with a declaration of his innocence. The District Court also stated that Appellant had to be physically removed from the courtroom after those proceedings had adjourned. Appellant attended the remainder of the trial without further disruptions after a warning from the Court.

Court's offers to wear the shock sleeve, saying fear of an accidental shock would prevent him from focusing on the trial. The record which reached this Court was unclear about exactly what restraints Appellant wore at trial.

¶ 21 Following oral argument in this case, the Court remanded for an evidentiary hearing to clarify the nature of Appellant's restraints during the jury trial. Counsel for the parties stipulated in that hearing that Appellant wore leg irons around his ankles during proceedings before the jury. Appellant testified at the hearing that he was also handcuffed during the jury trial, but these claims were vague, self-serving, and contradicted by the remaining evidence. Appellant's restraints were obscured from the jury's view during individual *voir dire* by seating Appellant at the end of a table in the Court's chambers. During proceedings in open court, Appellant's leg irons were concealed from the jury by the placement of identical black curtains around the prosecution and defense tables. Testimony established that Appellant's movements to and from the courtroom occurred outside the presence of jurors. A deputy testified that every effort was made to conceal Appellant's restraints from jurors at all times. The members of the trial jury each testified that they were unaware that Appellant was wearing any form of restraints during the trial. Most of the jurors saw the curtains at the tables, but thought nothing of the matter.

¶ 22 By his own objections, Appellant has preserved the issue for appellate review. The principle of law we consider here has an ancient and impressive history. In Henry of Bracton's LAWS AND CUSTOMS OF ENGLAND, collected around A.D. 1230, we are told that "when the person thus arrested is to be brought before the justices he ought not to be brought with his hands tied (though sometimes in leg-irons because of the danger of escape) *lest he may seem constrained to submit to any form of trial.*" (emphasis added). 2 H. BRACTON, LAWS AND CUSTOMS OF ENGLAND 385 (Thorne, Ed.). Chief Justice John Kelyng's REPORT OF CROWN CASES, dating from 1660, shows "it was resolved that, when Prisoners come to the Bar to be tryed, their Irons ought to be taken off, so that they be not in any Torture while they make their defense, be their Crime never so great. And accordingly upon the Arraignment and Tryal of *Hewlet* and others, who were brought in Irons, the Court commanded their Irons be taken off." J. Kelyng, A REPORT OF DIVERS CASES IN PLEAS OF THE CROWN, ADJUDGED AND DETERMINED, IN THE REIGN OF THE LATE KING CHARLES II, WITH DIRECTIONS FOR JUSTICES OF THE PEACE AND OTHERS 11 (3d ed. 1873). Justice Kelyng was speaking directly of the accused traitors indicted for compassing the murder of the late King Charles I. *Id.* Lord Matthew Hale, Sir William Hawkins, and Sir William Blackstone also set down the common law rule that a prisoner brought into court for jury trial must appear "free of all manner of shackles or bonds" unless there was "evident danger of his escape." 2 M. HALE, PLEAS OF THE CROWN 219; II W. HAWKINS, PLEAS OF THE CROWN 308; 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 317 (1st ed., 1769), *citing Layer's Case,* 6 STATE TRIALS (4th ed., by Hargrave) 230; *see also, Waite's Case,* 1 LEACH'S CASES IN CROWN LAW 36.

¶ 23 In 1953, the Legislature amended Title 22, section 15, adding the final clause providing that "in no event shall he be tried before a jury while in chains or shackles." The amendment came in response to this Court's controversial decision the previous year in *DeWolf v. State,* 1952 OK CR 70, 95 Okla.Crim. 287, 245 P.2d 107. In *DeWolf,* the District Court ordered a capital murder defendant tried before the jury in leg irons, allowing the restraints removed only when defendant took the witness stand. He was convicted and sentenced to death. 95 Okla. Crim. at 291, 245 P.2d at 112. Framing the question on appeal as whether the actions of the trial court denied due process of law, this Court acknowledged the common law rule that a defendant be "free of all manner of shackles and bonds, unless there be evident danger of escape, and then he may be secured by irons." 95 Okla.Crim. at 291–292, 245 P.2d at 113, *citing* 4 W. BLACKSTONE, COMMENTARIES 322, supra.

¶ 24 The Court in *DeWolf* considered section 15 declarative of the common law rule

and its exceptions, and reasoned that the statute granted the trial judge considerable discretion in determining what restraint was necessary for defendant's detention to answer the charge. The appellant in *DeWolf* had prior violent felony convictions and had escaped from custody. The sheriff thought him intent upon an escape during the trial, and he was known to create handcuff keys and weapons from items in his jail cell. 95 Okla.Crim. at 291, 245 P.2d at 112–113.

¶ 25 This Court held that "restraint by means of surveillance, shackles and leg irons and other means of maintaining order and preventing acts of violence and escape are matters within the sound judicial discretion of the trial court." 95 Okla.Crim. at 294–295, 245 P.2d at 115. "[E]ach case must depend on its own facts, and this court will scrutinize with the greatest care every such case in search of abuse of discretion." 95 Okla.Crim. at 295, 245 P.2d at 116. The Court in *De-Wolf* ultimately decided "the trial court's conclusions [to shackle defendant at trial] were well founded" and affirmed the judgment and sentence of death. 95 Okla.Crim. at 295, 245 P.2d at 116, 124. *DeWolf* was not well-received in the Legislature, which passed the 1953 amendment to section 15 "in order that, never again, could a defendant be tried for any crime without the full use of his faculties and with the presumption of innocence the law allows." *Baker v. State,* 1967 OK CR 178, ¶ 17, 432 P.2d 935, 940.

¶ 26 After the 1953 amendment expressly prohibited the restraint approved in *DeWolf,* almost a decade passed before a District Court ran foul of the statute again in a reported case. In *French v. State,* 1962 OK CR 157, 377 P.2d 501, *overruled in part in Peters v. State,* 1973 OK CR 443, ¶ 13, 516 P.2d 1372 (see discussion, infra), the capital defendant was brought before the jury prior to the commencement of trial escorted by three armed guards, and wearing visible handcuffs shackled to a six inch belt around his body. On another day, he was seated at counsel table while several jurors were seated in the jury box. Two of the defendant's escorts removed the handcuffs and large belt in full view of the jurors. The District Court denied counsel's request for a mistrial, find-ing the first occurrence happened before the trial had begun, and the second while court was not in session. French was convicted of murder and sentenced to death. On appeal, he argued the District Court violated section 15. *French,* at ¶¶ 1–4, 377 P.2d at 502.

¶ 27 Writing for the Court, Judge Nix characterized the guarantee of section 15 as protecting the defendant's common law right "to appear in court with free use of his faculties, both mentally and physically." *Id.* at ¶ 6, 377 P.2d at 502. The Court contrasted how the earlier version of section 15 "left the court with a broad discretion to determine what was necessary" in terms of a defendant's restraints, while the 1953 amendment had "removed any and all discretion that the trial court had" in the matter. *French,* at ¶¶ 12–13, 377 P.2d at 503. This Court found the Legislature had also intended by the exacting language of the 1953 amendment to preserve the defendant's presumption of innocence, recognizing that "a man brought before the court in chains and shackles was prejudiced in the minds of the jury," who would conclude that he was "a dangerous criminal who had to be chained and shackled to prevent his escape or prohibit him from doing harm to others or any act of violence." *French,* at ¶ 13, 377 P.2d at 503. Section 15's prohibition against restraints at trial "permits no discretion nor ramifications. It simply says it shall not be done." *French,* at ¶ 15, 377 P.2d at 504. Guided by these principles, the Court found the statute was "designed to prohibit an occurrence as is depicted in the case at bar," and reversed the conviction. *Id.* at ¶¶ 5, 24, 377 P.2d at 502, 505.

¶ 28 In *Davis v. State,* 1985 OK CR 140, 709 P.2d 207, the appellant sat through his capital murder trial in court-ordered leg irons. Appellant in *Davis* was considered a security risk and shackled at the direction of the County Sheriff. However, the record on appeal failed to establish "any disruptive or disrespectful conduct on the part of appellant justifying the use of shackles." *Id.* at ¶ 4, 709 P.2d at 209. The Court found the defendant's restraints violated section 15. In a special concurrence, Judge Brett added that "the trial judge is bound to proceed in accor-

dance with 22 O.S.1981, § 15 until some reason develops to proceed otherwise. Further, when restraint becomes necessary, *the record should be made completely clear why restraint is being applied.*" *Davis*, at ¶ 2, 709 P.2d at 210. (Brett, J., specially concurring) (emphasis added). Although the State argued the error was harmless because the jury had not seen appellant in leg irons until he took the witness stand in the sentencing phase of trial, this Court declined to limit the statutory prohibition to guilt-phase trials and reversed the conviction. *Id.* at ¶¶ 5–6, 709 P.2d at 209.

■ ¶ 29 In cases since the *French* case, the Court has clarified that the prohibition against restraints in section 15 is not absolute. The right to be free from restraints may be waived "if defendant engages in misconduct so disruptive and disrespectful that the trial cannot continue." *Peters v. State*, 1973 OK CR 443, ¶ 13, 516 P.2d 1372, 1374–75. The appellant in *Peters* ran from the courtroom during trial, and engaged in two outbursts before the jury. *Id.* at ¶¶ 10–12, 516 P.2d at 1374. This Court found the trial judge gave appellant "every opportunity" to be present without handcuffs if he would not disrupt the proceedings. *Id.* at ¶ 15, 516 P.2d at 1375. The Court affirmed the judgment though the defendant was handcuffed for a portion of the trial, overruling language in *French* and other cases indicating the prohibition against restraints admitted no exceptions. *Peters*, at ¶ 12, 516 P.2d at 1374–75.

■ ¶ 30 We conclude from the foregoing history that the current version of section 15 has removed the discretionary common law authority to restrain a defendant before the jury at trial. Section 15 imposes a strong presumption against such restraint, which can be overcome only by evidence of a defendant's disruptive or aggressive behavior in court, or an expressed or implied intention to engage in such behavior. In *Ochoa v. State*, 2006 OK CR 21, 136 P.3d 661, we found the District Court violated section 15 by compelling the appellant to wear a shock sleeve during his mental retardation trial. Counsel did not object to the shock sleeve, but appellant repeatedly objected. *Ochoa*, at ¶ 21, 136 P.3d at 667. The record showed that counsel

and the Court were concerned the appellant might disrupt the proceedings. *Id.* at ¶ 29, 136 P.3d at 669. When he asked why he was being restrained, the District Court replied that appellant had told his counsel he would disrupt the trial, but no testimony was taken to establish this fact. The record did not disclose the nature of counsel's concern about appellant's behavior, nor did it reflect any disruptive or aggressive behavior by appellant before the District Court ordered him to wear the shock sleeve. The District Court in *Ochoa* characterized its use of the shock sleeve simply as "insurance" and a "precautionary" measure should appellant be tempted to disrupt the trial. We held on these facts the use of restraints before the jury violated section 15. *Ochoa*, at ¶¶ 29–30, 136 P.3d at 669.

¶ 31 *Ochoa* provides an analysis appropriate to the case before us. The record here supports the conclusion that the District Court's decision to order Appellant restrained, either with the shock sleeve or shackles, was a precautionary security measure at best. The order was prompted by a law enforcement request, rather than specific facts showing Appellant's intent to harm anyone or disrupt the trial. In this respect, the District Court's error is identical to the violation of section 15 in *Davis*, where the defendant "was apparently shackled [at trial] at the direction of the County Sheriff, and no basis for that decision is found in the record." *Davis*, at ¶ 4, 709 P.2d at 209. Indeed, the District Court in this case expressed the view that "if law enforcement thought and recommends that that's what has to be done [placing defendant in restraints], I don't even— I'm not even in that loop really. If they want to do it, I think they can do it. There's no law that prevents them from just requiring you to do it."

¶ 32 We must note here that the requirements of section 15 were never raised by counsel or considered on the record in connection with the District Court's decision. Neither prosecution nor defense counsel—at least five seasoned criminal practitioners in all—directed the District Court's attention to section 15 or case law applying the statute. Nor did counsel for either party mention the

Supreme Court's 2005 decision in *Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005), overturning a death penalty verdict on due process grounds because the prisoner was tried before a jury in visible chains without specific factual findings to justify the restraint. Even a brief perusal of section 15 and its annotations would have given the District Court reason to doubt the legality of ordering Appellant restrained in irons before the jury for unspecified security reasons or merely at the request of law enforcement. Forty-six years ago, Judge Nix said that "[i]nside the portals of the court room, the trial judge is master ... [and] should use *every precaution within his grasp to see that the defendant is not paraded before the jury or jury panel in chains or shackles.*" *French,* at ¶ 20, 377 P.2d at 504. (emphasis added). More than twenty years ago, Judge Brett said "[t]he Sheriff does not control the courtroom. That is the responsibility of the trial judge. The trial judge is *bound to proceed in accordance with the terms of 22 O.S.1981 § 15 until some reason develops to proceed otherwise.*" *Davis,* at ¶ 2, 709 P.2d at 210. (Brett, J., specially concurring)(emphasis added).

¶ 33 Appellant might very well have been a threat, but an order to restrain him at trial in derogation of section 15 required a factual predicate sufficient to justify the restraint and permit this Court's review of the decision on appeal. The record here lacks the necessary factual justification. Appellant had not disrupted the proceedings at the time the shackling order was made, nor had he expressed or implied any intention to do so, as far as the record reflects. A mere belief that Appellant might be a security risk did not justify a departure from the statutory command. The District Court's restraint of Appellant with shackles before the trial jury clearly violated section 15. *Davis,* at ¶ 4, 709 P.2d at 209 ("The record fails to establish any disruptive or disrespectful conduct on the part of appellant justifying use of shackles. Moreover, there is not a scintilla of evidence that the appellant planned to disrupt the trial").

¶ 34 Before ordering that any defendant be tried before a jury restrained by a shock

sleeve, shackles, or any other form of physical restraint, the District Courts in future cases must make a specific finding on the record that the defendant has engaged in disruptive or aggressive behavior in connection with the proceedings, or made an express or implied threat to disrupt the proceedings or endanger public safety during the trial. The Court must further specify the facts supporting this conclusion and demonstrating that restraint of the defendant during the trial is necessary to prevent the disruptive or threatening behavior. Defendant must be afforded an opportunity to be heard in opposition to any order to wear restraints and present evidence bearing on the issue. If the facts supporting the Court's decision to use restraints include material protected by attorney-client confidentiality, disclosure of which to the State would violate the defendant's right to confidentiality, attorney-client privilege, or the privilege against self-incrimination, the Court should to that extent conduct the proceedings *ex parte,* memorialize the facts justifying the restraint, and preserve the sealed record for appellate review.

¶ 35 We turn now to the question of whether we must reverse the judgment. While the prohibition against restraints safeguards a defendant's dignitary and tactical interests in making his defense without the mental and physical burdens of shackles, the principal harm with which statute concerns itself is *evidentiary,* in that it ordinarily forbids the prejudicial spectacle of a defendant clapped in irons during trial before a jury. A violation of the statute is not reversible error *per se.* In *Phillips v. State,* 1999 OK CR 38, 989 P.2d 1017, the District Court ordered a capital defendant to wear a stun belt during trial. On appeal, he argued the restraint violated section 15. The District Court's order was in response to defendant's prior outburst at another court proceeding and his prior violent behavior in jail. *Phillips,* at ¶¶ 52–54, 989 P.2d at 1033–1034. Despite these facts, this Court assumed the restraint violated section 15. The Court noted "[a]ll parties agreed the stunbelt was not visible to the jury," and there was no evidence the stunbelt hampered defendant physically or mentally. *Phillips,* at ¶ 55, 989 P.2d at 1034.

Absent such evidence, this Court found the error had no "substantial influence" on the outcome of the trial. *Id.* In *Ochoa,* supra, the record suggested the shock sleeve worn by defendant was either invisible to jurors under his clothing or minimally visible, and no more prejudicial than the defendant's decision to appear in prison garb at trial. Nor did the defendant claim the shock sleeve interfered with his ability to participate in his defense. On these facts, we found defendant had "not proven this error had a substantial influence on the outcome of the proceeding and has not shown prejudice." *Ochoa,* at ¶ 32, 136 P.3d at 670.

¶ 36 In this case, the District Court certainly encouraged Appellant to wear a shock sleeve under his clothing. Appellant refused the shock sleeve, believing it would prevent his concentration on the trial. Appellant was subjected to restraint by leg irons throughout the trial. The evidence before us is that every precaution was taken to conceal his restraints from jurors; and no trial juror actually viewed him in restraints. We do not condone the District Court's error in ordering Appellant restrained in violation of section 15, and such restraint will not be permitted without a proper factual record in the future. However, Appellant has not shown how the District Court's error had any substantial influence on the outcome at trial. Proposition One therefore requires no relief.

▪ ¶ 37 In Proposition Two, Appellant claims the District Court denied a full and fair examination of prospective jurors regarding their opinions on the death penalty. Prior to jury selection, prospective jurors filled out extensive questionnaires and returned them to the Court. Counsel had the benefit of these questionnaires when conducting individual *voir dire.* The District Court permitted individual, sequestered *voir dire* with every prospective juror, followed by a general *voir dire* examination in open court. The entire jury selection in this case consumed several days of court time and the first 1,600 pages of trial transcript. The State exercised eight peremptory challenges against prospective jurors and waived its ninth. Appellant exercised nine peremptory challenges against prospective jurors. The parties each exercised one peremptory challenge against the prospective alternates. Appellant did not request additional peremptory challenges when his nine were exhausted, nor did he allege that he was forced, over objection, to keep an unacceptable juror. Appellant therefore accepted the jury panel as it was constituted and failed to preserve any objection to the District Court's rulings on his challenges for cause. *Warner v. State,* 2001 OK CR 11, ¶ 10, 29 P.3d 569, 573–74. We will nevertheless review the District Court's conduct of *voir dire* to determine whether Appellant's constitutional rights were infringed.

¶ 38 The District Court asked each prospective juror about exposure to pre-trial publicity and issues involving capital punishment, including variations on the following inquiries found in Instruction No. 1–5, Alternate 2, OUJI–CR (2d):

> The defendant is charged with murder in the first degree. It will be the duty of the jury to determine whether the defendant is guilty or not guilty after considering the evidence and instructions of law presented in court.

> If the jury finds beyond a reasonable doubt that the defendant is guilty of murder in the first degree, the jury will then have the duty to assess punishment. The punishment for murder in the first degree is death, imprisonment for life without parole or imprisonment for life.

> If you find the defendant guilty of murder in the first degree, can you consider all three of these legal punishments—death, imprisonment for life without parole or imprisonment for life ... ?

> If you find beyond a reasonable doubt that the defendant is guilty of murder in the first degree, will you automatically impose the penalty of death?

▪ ¶ 39 The Committee on Oklahoma Uniform Jury Instructions–Criminal (OUJI–CR) added the question concerning whether a prospective juror would automatically impose the penalty of death in light of the Supreme Court's holding in *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In *Morgan,* the Su-

preme Court held that due process of law affords a capital defendant an opportunity to learn whether a prospective juror would automatically impose the death penalty. 504 U.S. at 735–36, 112 S.Ct. at 2233. The trial court may either conduct this inquiry, or permit counsel to inquire, or both. *Fitzgerald v. State*, 1998 OK CR 68, ¶ 31, 972 P.2d 1157, 1170 (denial of any opportunity to inquire was error); *Cannon v. State*, 1998 OK CR 28, ¶ 7, 961 P.2d 838, 844 (allowing inquiry by defense counsel was sufficient).

¶ 40 During jury selection, several jurors answered affirmatively when asked whether they would automatically sentence the defendant to death, seemingly contradicting earlier statements that they could fairly consider all three punishments for first-degree murder. When asked to clarify this apparently inconsistent response, it became clear that prospective jurors were confused by the automatic death penalty question. The District Court noted how the sequencing of the question and its phrasing seemed to suggest to prospective jurors that the law required an automatic sentence of death for a conviction of first degree murder. Several jurors understandably reacted to the conflicting implications of the automatic death penalty question with another question or a statement indicating some confusion: "Say that again?;" "Repeat that?;" "I believe in the death penalty;" "Could you repeat that?;" "Automatically?;" "Can you read that again, please?;" "Can you repeat it again, please?;" "I don't know. Maybe you need to—I don't know."

¶ 41 The following exchange between the court and a thoughtful prospective juror illustrates the confusing nature of the automatic death penalty question:

The Court: The punishment for murder in the first degree is death, imprisonment for life without parole, or imprisonment for life. If you find the defendant guilty of murder in the first degree, can you consider all three of these legal punishments: Death, imprisonment for life without parole, or imprisonment for life, and impose the one warranted by law and the evidence?

Prospective Juror: Yes. Are you asking if I have an idea of what it should be if he's found guilty, or if I can fairly choose the one that's most right according to this case?

The Court: The latter.

Prospective Juror: I can.

The Court: If you are on this jury and if you find beyond a reasonable doubt that the defendant is guilty of murder in the first degree, would you automatically impose the death penalty?

Prospective Juror: If that's what the guidelines are.

The Court: That wasn't the question.

Prospective Juror: Go ahead. Say it again, please.

The Court: If you found beyond a reasonable doubt that the defendant is guilty of murder in the first degree, would you automatically impose the death penalty?

Prospective Juror: Now wait, because you just asked me before if I would do what—

The Court: Give equal consideration.

Prospective Juror: Right.

The Court: So you would give equal consideration?

Prospective Juror: Right. That's what I answered to just a minute ago, right, that I would give—

The Court: Yes, you did.

Prospective Juror: Okay.

The Court: That's correct.

Prospective Juror: I mean, I would have no problem if the law said this is what the punishment is for this crime, I have no problem saying the death penalty is the punishment, that's the punishment. But if the law says it can be one of these, then it depends on what the law tells me to do.

The Court: And if the law tells you, you have to give equal consideration to all three, you would do that?

Prospective Juror: If that's what the law said, yes, I would.

The Court: Well, I just told you that's what it is.

Prospective Juror: Okay. Yes, sir, I could.

¶ 42 When the Court and the State expressed concerns about the automatic death penalty question, defense counsel objected to

the District Court's plan to clarify the question with follow-up questions if necessary, arguing (very much in the face of the evidence) that the question was not confusing to prospective jurors. The District Court overruled defense counsel's objections, and where prospective jurors expressed confusion about the automatic death penalty question, the District Court followed up with clarifying questions, usually by saying to the prospective juror "you will not *just* automatically impose the death penalty?" or words of similar import. Prospective jurors then seemed to understand this question addressed itself to their willingness to fairly consider all three punishments for murder, rather than being irrevocably committed to the death penalty.

¶ 43 A review of the entire *voir dire* shows that the District Court could readily distinguish between the prospective jurors who were initially befuddled by the automatic death penalty question and those irrevocably committed to imposing the death penalty for murder. The District Court properly disqualified several prospective jurors who would automatically impose a death sentence in the event of a first degree murder conviction. The District Court also permitted additional, individual *voir dire* by counsel on these subjects. These *voir dire* questions cast additional light on prospective jurors' attitudes about capital punishment. The prosecutor quizzed jurors about how they would vote in a death penalty referendum. Defense counsel's questions ensured that prospective jurors understood no particular punishment was favored by the law more than another. On the whole, *voir dire* provided the Court and counsel with a wealth of information about prospective jurors' attitudes on the issue of capital punishment.

¶ 44 The purpose of *voir dire* examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. The manner and extent of *voir dire* lies within the District Court's discretion. The District Court may properly restrict questions that are repetitive, irrelevant or regard legal issues upon which the trial court will instruct the jury.

There is no abuse of discretion as long as the *voir dire* examination affords the defendant a jury free of outside influence, bias or personal interest. *Young v. State*, 2000 OK CR 17, ¶ 19, 12 P.3d 20, 31–32 (and cases cited). A prospective capital juror should be excused for cause when the juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Due process of law requires that a prospective juror be willing to consider all the penalties provided by law and not be irrevocably committed to a particular punishment before the trial begins. *Hain v. State*, 1996 OK CR 26, ¶ 21, 919 P.2d 1130, 1138. *Morgan v. Illinois*, supra, thus guarantees a capital defendant's right to inquire whether a prospective juror is irrevocably committed to imposing a death sentence.

¶ 45 While this case shows that the questions put to prospective jurors in a death penalty *voir dire* can be confusing to laypersons, the District Court's careful and repeated inquiries about each juror's qualifications sufficiently protected Appellant's rights to identify unqualified jurors and intelligently exercise peremptory challenges. Somewhat contrary to Appellant's suggestions on appeal, defense counsel at trial remarked that when a prospective juror's contradictory responses to the automatic death penalty question suggested a misunderstanding, "[t]he Court has, upon further inquiry, *cleared up any of the confusion*." (emphasis added). That is a fair assessment of the proceedings before us. Further, Appellant sought no additional peremptory challenges and identified no juror on the final panel who was unacceptable to him, and thus cannot show prejudice from the District Court's alleged errors. *Gilbert v. State*, 1997 OK CR 71, ¶ 32, 951 P.2d 98, 109. No relief is warranted.

¶ 46 Proposition Three challenges the State's seizure of Appellant's DNA as a violation his constitutional right to be secure in his person from unreasonable search and seizure. U.S. Const. amend. IV, XIV; Okla. Const. art. II, § 30. As a result of Appellant's incarceration for second de-

gree burglary in 2002, the Department of Corrections collected his blood and submitted it to the Oklahoma State Bureau of Investigation. OSBI then developed Appellant's DNA profile and maintained it in the OSBI's Combined DNA Index System (CODIS), from which the State ultimately obtained a DNA match to evidence from the Busken murder.

¶ 47 The Legislature established the Combined DNA Index System "for the purpose of collecting and storing blood or saliva samples and DNA profiles, analyzing and typing of the genetic markers contained in or derived from DNA, and maintaining the records and samples of DNA" of individuals required to provide a sample by the statute. 74 O.S.Supp.2002, § 150.27a. Earlier versions of the law required a sample from certain sexual and violent offenders, while the current law directs the Department of Corrections to collect blood or saliva samples from every person convicted of a felony offense, and to forward the sample to OSBI for DNA profiling and storage in the CODIS. 74 O.S.Supp. 2006, § 150.27a (A). In past and present versions of the statute, the Legislature has specified that the purpose of the CODIS is "the detection or exclusion of individuals who are subjects of the investigation or prosecution of sex-related crimes, violent crimes, or other crimes in which biological evidence is recovered, and such information shall be used for no other purpose." *Id.*

¶ 48 Appellant challenges the statutory practice of collecting blood or saliva samples from inmates as an unreasonable search or seizure in violation of the Fourth Amendment and Article II, section 30. We agree with Appellant that the State's collection of an involuntary sample of an offender's blood, saliva, or other genetic material for the purpose of DNA typing and recording a known offender's DNA profile in the CODIS, is a search and seizure that must satisfy the constitutional requirement of reasonableness. *Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (holding bodily intrusions involved in blood tests, breath tests, and the taking of urine are searches under the Fourth Amendment). We make two further

assumptions for the sake of this argument: that Appellant was neither asked for, nor gave, his consent to the State's seizure of his genetic material; and that the seizure was not based on any individualized suspicion of Appellant amounting to either probable cause or reasonable suspicion. The remaining question is whether this warrantless, suspicionless seizure of Appellant's blood or saliva and development of his DNA profile for comparison was a reasonable search and seizure.

¶ 49 A series of cases from the United States Courts of Appeals have addressed whether this type of search violates the Fourth Amendment to the United States Constitution. In *Jones v. Murray*, 962 F.2d 302 (4th Cir.1991), *cert. denied*, 506 U.S. 977, 113 S.Ct. 472, 121 L.Ed.2d 378 (1992), the Fourth Circuit rejected a Fourth Amendment challenge to a statute requiring convicted felons to submit blood samples for DNA analysis and inclusion in a data bank for law enforcement purposes. The Court of Appeals determined there is no *"per se* Fourth Amendment requirement of probable cause, or even a lesser degree of individualized suspicion, when government officials conduct a limited search for the purpose of ascertaining and recording the identity of a person who is lawfully confined to prison." *Jones*, 962 F.2d at 306. The Court of Appeals relied in part on an inmate's diminished expectation of privacy in the prison setting.

¶ 50 In *Rise v. Oregon*, 59 F.3d 1556, 1558–59 (9th Cir.1995), *cert. denied*, 517 U.S. 1160, 116 S.Ct. 1554, 134 L.Ed.2d 656 (1996), an Oregon statute required all inmates convicted of murder or sex offenses, or certain related crimes, to submit DNA samples for inclusion in a data bank. The Court of Appeals noted that "[t]he information derived from the blood sample is substantially the same as that derived from fingerprinting—an identifying marker unique to the individual from whom the information is derived." *Rise*, 59 F.3d at 1559.

[E]veryday 'booking' procedures routinely require even the merely accused to provide fingerprint identification, regardless of whether the investigation of the crime involves fingerprint evidence ... Once a per-

son is convicted of one of the felonies included as predicate offenses under [the statute], his identity has become a matter of state interest and he has lost any legitimate expectation of privacy in the identifying information derived from the blood sampling.

*Id.* at 1560. The Court of Appeals found that although obtaining DNA requires drawing blood (or saliva) as opposed to "inking and rolling a person's fingertips," *id.*, the intrusion on the inmate's diminished Fourth Amendment interests is minimal.

¶ 51 The Court of Appeals then balanced the minimal intrusion on the prisoner's Fourth Amendment interests against the legitimate government interest in identifying and prosecuting murderers and sex offenders, the degree to which gathering the DNA information would advance that interest, "and the severity of the resulting interference with individual liberty." *Rise,* 59 F.3d at 1560. Noting "the public's incontestable interest in preventing recidivism and identifying and prosecuting murderers and sexual offenders, and the likelihood that a DNA bank will advance this interest," the Ninth Circuit Court of Appeals also concluded that the seizure mandated by the state's DNA collection statute was reasonable under the Fourth Amendment. *Id.* at 1562.

¶ 52 In *Boling v. Romer,* 101 F.3d 1336 (10th Cir.1996), inmate plaintiffs challenged a Colorado statute requiring convicted sex offenders to provide DNA samples before their release on parole as an unreasonable search and seizure in violation of the Fourth Amendment. The Tenth Circuit Court of Appeals reached the same conclusion as the Fourth and Ninth Circuits:

[W]e hold that while obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights, *see Dunn v. White,* 880 F.2d 1188, 1195 (10th Cir.1989) (in upholding AIDS testings against inmates' Fourth Amendment challenge, stating that "plaintiff's privacy expectation in his body is further reduced by his incarcer-

ation"), *cert. denied,* 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990); the minimal intrusion of saliva and blood tests; and the legitimate government interest in the investigation and prosecution of unsolved and future criminal acts by the use of DNA in a manner not significantly different from the use of fingerprints.

*Boling,* 101 F.3d at 1340. Largely relying on its ruling in *Boling* and the conclusions of the Fourth and Ninth Circuits, the Tenth Circuit turned away a Fourth Amendment challenge to the Oklahoma DNA testing statute in *Shaffer v. Saffle,* 148 F.3d 1180, 1181 (10th Cir.1998).

¶ 53 We are persuaded by these authorities that the seizure of Appellant's blood and development of his DNA profile were reasonable under the Fourth Amendment to the United States Constitution and Article II, section 30 of the Oklahoma Constitution. The State's legitimate interest in the collection and storage of this highly probative form of identification for use by law enforcement in the detection and prevention of past and future crimes far outweighs a convicted prisoner's minimal interest in freedom from a brief intrusion required to collect a sample of genetic material. The District Court properly denied Appellant's motion to suppress the resulting evidence of his DNA profile and its comparison to the previously unknown DNA profile developed after the murder of Juli Busken. Proposition Three is denied.

¶ 54 In Proposition Four, Appellant challenges the District Court's admission of evidence tending to show that shoe prints at the scene of the Busken murder were similar to a pair of Nike shoes owned by Appellant. Investigators observed and photographed two pairs of shoe prints in the soil leading to where Juli Busken's body was found. One pair of shoe prints correlated to hiking boots worn by Ms. Busken. The other pair of shoe prints led down to the killing scene and then back toward the road. Police compared photographs of these prints to a variety of shoes and came to believe the soles were similar to the Nike *Air Max 2.* Photographs of the questioned shoe print were admitted at trial, along with inked imprints and acetate overlays of the Nike *Air Max 2*

shoes provided by the Nike Corporation. The State then presented testimony from Appellant's ex-girlfriend, Christin Setzer, who read to the jury an October 14, 1996, entry from her personal calendar indicating that she and Appellant had purchased matching Nike shoes that day. The District Court also admitted the page from Ms. Setzer's calendar in evidence.

¶ 55 Appellant first objects that the testimony of Ms. Setzer's calendar entry was inadmissible hearsay. He has preserved his objection on appeal. The District Court's admission or exclusion of evidence over a timely objection or offer of proof is ordinarily discretionary and will not be reversed on appeal unless clearly erroneous or manifestly unreasonable. *Hancock v. State,* 2007 OK CR 9, ¶ 72, 155 P.3d 796, 813. Hearsay is an out of court statement offered at trial to prove the truth of matters asserted therein. 12 O.S.2001, § 2801. Hearsay statements are generally inadmissible, subject to numerous well-known exceptions. 12 O.S.2001, § 2802. The Evidence Code excepts from the hearsay rule a "record concerning a matter about which a witness once had knowledge but now has insufficient recollection to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly. The record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party." 12 O.S. 2001, § 2803(5).

¶ 56 Appellant concedes that the calendar entry might have been admissible as a past recollection recorded, if the State had laid a foundation showing the witness' lack of recollection. Appellant reasons the District Court improperly admitted the testimony of Ms. Setzer, because if she could testify to Appellant's purchase of the Nike shoes from her personal recollection without reference to the document, the calendar entry itself was inadmissible hearsay. At trial, defense counsel initially objected the witness had no recollection of the shoe purchase, but her direct testimony for the State showed the contrary. The witness testified that she remembered, independent of her calendar entry, the pur-

chase of matching Nike shoes with Appellant in 1996. On cross-examination, defense counsel elicited that police had shown the witness a pair of Nike *Air Max 2* shoes and asked her if the shoes were similar to the ones bought by Appellant in 1996. She testified the shoes shown to her by police were similar to Appellant's, but she could not positively say the shoes were the exact model purchased by Appellant. While the evidence of Appellant's purchase of the shoes came from the witness' personal knowledge, it is apparent that the witness could not have remembered the specific date in October, 1996, on which the shoes were purchased over a decade earlier, without reference to the entry in her calendar. For this purpose, the witness' reading of the calendar entry was admissible under the hearsay exception for a past recollection recorded. Admission of the document itself as a State exhibit, while contrary to the language of the rule, was cumulative and did not result in unfair prejudice. 12 O.S.2001, § 2803(5).

¶ 57 Appellant next argues the entirety of the shoe comparison evidence was erroneously admitted, because the State failed to establish a sufficient "nexus" associating Appellant with a pair of Nike *Air Max 2* shoes and the shoe impressions photographed at the scene. Appellant ignores a series of incriminating inferences from other evidence, such as his DNA, when he claims "the shoe print was the only tangible evidence which could provide a direct connection to Ms. Busken's homicide and the killer ... [and unless] the State can put a pair of Nike *Air Max 2's* on Mr. Sanchez, as opposed to just any Nike Air-style of shoe, then all of the evidence concerning shoe prints was irrelevant and should have been excluded."

¶ 58 Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. 12 O.S.2001, § 2401. Contrary to Appellant's premise in argument, relevant evidence need not conclusively, or even directly, establish the defendant's guilt. Evidence from which the jury may adduce

the guilt or innocence of the defendant is admissible if, when taken with other evidence in the case, it tends to establish a material fact in issue. Relevancy and materiality of evidence "are matters within the sound discretion of the trial court absent an abuse thereof." *Patton v. State*, 1998 OK CR 66, ¶ 73, 973 P.2d 270, 293–94, *citing Robedeaux v. State*, 1993 OK CR 57, ¶ 60, 866 P.2d 417, 432. An abuse of discretion is a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented. *C.L.F. v. State*, 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946.

¶ 59 Evidence tending to establish that Appellant owned shoes with a sole design similar to shoe prints found near a murdered girl, from whose clothing his DNA was recovered, is clearly relevant in a trial for sexual assault and murder. For many decades, trial courts in this State have admitted testimony about shoe prints connected with a crime scene, and the comparison of those impressions to shoes associated with the accused. We find this type of evidence admitted in *Simpson v. State*, 1992 OK CR 13, ¶ 2, 827 P.2d 171, 173 (impressions similar to shoes worn by defendant found on window); *Cleveland v. State*, 1977 OK CR 214, ¶ 5, 566 P.2d 144, 145 (photograph of shoe impression near crime scene and investigator's testimony of similarity upon comparison to defendant's boot); *Taylor v. State*, 1952 OK CR 160, 96 Okla.Crim. 188, 190, 251 P.2d 523, 525 (same); *McCoin v. State*, 1952 OK CR 9, 95 Okla.Crim. 93, 93–94, 240 P.2d 452, 453–54 (finding evidence of a print similar to defendant's shoe was important circumstantial evidence of guilt); *Rice v. State*, 1950 OK CR 150, 93 Okla.Crim. 86, 91–91, 225 P.2d 186, 189 (evidence of similarity of impression to defendant's shoes); *Beam v. State*, 1939 OK CR 26, 66 Okla.Crim. 14, 16, 89 P.2d 372, 373 (testimony of comparison of impressions at crime scene with defendant's shoes). Such evidence has figured significantly in several capital cases. *Miller v. State*, 1998 OK CR 59, ¶¶ 36–37, 977 P.2d 1099, 1108 (expert testimony comparing defendant's sandal impression to bloody print); *Hooper v. State*, 1997 OK CR 64, ¶¶ 6, 31, 947 P.2d 1090, 1096, 1103 (evidence that defendant's shoe print was similar to impression left at murder

scene); *Cudjo v. State*, 1996 OK CR 43, ¶ 25, 925 P.2d 895, 901 (evidence of investigator's opinion that shoe print at crime scene matched defendant's shoes); *Hooker v. State*, 1994 OK CR 75, ¶ 30, 887 P.2d 1351, 1360 (evidence of bloody shoe print at crime similar to shoes worn by defendant, which were common brand and could have belonged to others).

¶ 60 Appellant's objection here is not unlike the challenge to shoe print evidence in *Patton v. State*, 1998 OK CR 66, 973 P.2d 270. In *Patton*, the appellant in a capital murder case challenged the relevancy of a photograph of an unidentified shoe print that developed briefly after police sprayed Luminol in the crime scene. This Court held admission of the evidence was proper:

> State's Exhibit 103 was a Polaroid photograph showing a portion of the bloody shoeprint. The officer who observed the print made a drawing of it to help preserve the image in his memory. This drawing was admitted as State's Exhibit 336. A print similar to the shoe print was admitted as State's Exhibit 51. Each of these exhibits was admitted over defense objection. Now, as at trial, Appellant challenges the relevancy of the exhibits ... *Although these exhibits were not identified as having belonged to Appellant or any other specific individual, they were relevant in showing the possibility of a person other than Appellant in the victim's home, a fact Appellant alluded to in one of his interviews. The exhibits were also relevant in showing the police conducted a thorough investigation and the prosecution was not hiding any evidence.* (emphasis added).

*Patton*, at ¶¶ 72–74, 973 P.2d at 293–94. Through cross-examination and argument, Appellant advanced the theory at trial that someone else killed Juli Busken. According to this theory, the real killer, not the Appellant, made the shoe prints found near her body at the lake. Given his theory of defense, Appellant correctly perceives that evidence connecting him to *Nike* shoes with soles similar in appearance to impressions at the crime scene is "particularly harmful." But the jury was certainly entitled to weigh

the plausibility of Appellant's theory of defense by considering shoe impressions and other evidence left at the scene, including Appellant's DNA, as circumstantial evidence about who committed the murder. We find this evidence "tended to place the defendant at the scene of the crime, and it was for the jury to determine the weight and value to be given this evidence." *Martin v. State*, 1961 OK CR 30, ¶ 14, 360 P.2d 253, 256. Proposition Four is without merit.

¶ 61 In Proposition Five, Appellant challenges the sufficiency of the evidence to convict him of murder and rape. Despite conceding that the DNA evidence establishes "a strong connection between Mr. Sanchez and a sexual assault," Appellant argues the evidence of murder is insufficient. Appellant's major points may be summarized as follows: (1) Other than his ability to drive a standard transmission, "nothing whatsoever places him in the car," meaning none of the fingerprints developed from inside Ms. Busken's vehicle could be matched to him; (2) although Appellant finds it "obvious that Ms. [Keller] described Juli Busken" as the female she saw in the red car near Lake Stanley Draper, the witness' description of the driver as an older man points to someone other than Appellant, who had just turned eighteen; (3) because of the narrow time frame established by the respective sightings related by Janice Keller and David Kill, of two people riding together around 6:45, and then the lone driver leaving Lake Stanley Draper around 7:15, the sexual assault probably occurred elsewhere. Appellant therefore reasons that the "times involved lend themselves to more than one person involved."

¶ 62 This Court's task in reviewing the sufficiency of the evidence is simply to assess "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *Young*, at ¶ 35, 12 P.3d at 35, *citing Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203. The evidence presented at trial tends to show that Appellant forced Ms. Busken into her own car around 5:30 a.m., sexually assaulted her in an unknown location, and murdered her on the shoreline of Lake Stanley Draper around 7:00 a.m on December 20, 1996. Appellant then returned to Norman and dumped the car, taking a few belongings with him, including Ms. Busken's ring, cell phone, compact disc player, and radar detector.

¶ 63 Three strands of evidence contradict Appellant's major premise that he cannot be placed at the scene of the murder or in Ms. Busken's car: First, Appellant's DNA matched the unknown DNA isolated from sperm fractions recovered from Ms. Busken's panties, and the unknown DNA from the pink leotard found discarded at the crime scene. Police also identified human sperm from stains found on pajama bottoms recovered from Ms. Busken's car. These facts permit the logical inference that the sperm on the pajama bottoms in Ms. Busken's car is also Appellant's, despite inconclusive DNA results on the pajama bottoms. Second, records of activity on Ms. Busken's missing cell phone show a call placed to a number which investigators eventually associated with Appellant's former girlfriend, over thirty hours *after* the Busken murder. The logical inference is that Appellant was in possession of Ms. Busken's phone, and he got the phone from her car, where she usually left it. Finally, the shoe impressions discussed in Proposition Four, consistent with a pair of Nike shoes owned by Appellant, tend to establish his presence where Ms. Busken was murdered. This direct and circumstantial evidence is sufficient to support the jury's finding that Appellant sexually assaulted and murdered Juli Busken.

¶ 64 In the second sub-proposition to Proposition Five, Appellant argues the evidence is insufficient to support a conviction for first degree rape. In particular, Appellant argues the absence of trauma to the vaginal area and the absence of any detectible semen or spermatozoa in the vaginal cavity fails to establish the penetration required by statute. Certainly the evidence of abduction and the condition of Ms. Busken's body and clothing at the time of her death support the inference that Appellant intended a sexual assault. These circumstances, and the presence of human spermatozoa in the anal cavity, readily establish the

penetration necessary to convict Appellant of forcible sodomy.

¶ 65 The evidence of observable trauma to Ms. Busken's genital area was a small contusion in the right area of the labia, and a slight abrasion to the perianal area. The Medical Examiner described the labia for the jury as "the outer genitalia of a woman outside of the vagina." However, the diagram of the injury admitted in State's Exhibit 1A shows the labial contusion was located on the inner lip of the labia minora. The character of Appellant's assault is further shown from the cluster of oval-shaped contusions observed on the inner thigh, which support the inference of his intent to forcibly penetrate the genitalia. The Medical Examiner testified that he observed no internal trauma to the vagina.

¶ 66 Any penetration of the female genitalia by the male penis, however slight, is sufficient to constitute the completed offense of rape. *Warner v. State*, 2006 OK CR 40, ¶ 36, 144 P.3d 838, 863; *Kitchen v. State*, 1937 OK CR 99, 61 Okla.Crim. 435, 443, 69 P.2d 411, 414 (crime of rape demands "proof of some degree of entrance of the male organ 'within the labia of the pudendum'"). We find the State's evidence of a contusion to the interior surface of the labia, when considered in the light most favorable to the prosecution with all the remaining facts and circumstances, would permit any rational trier of fact to find the elements of rape established beyond a reasonable doubt. Proposition Five is denied.

¶ 67 In Proposition Six, Appellant argues the District Court erroneously admitted sentencing stage evidence showing Appellant's sexual assault of a girlfriend in 2001 as proof of the continuing threat aggravating circumstance. We review the admission of this evidence only for abuse of discretion. *Hancock*, supra. The State presented sentencing stage testimony from Appellant's former girlfriend tending to show that in September, 2001, Appellant entered her apartment without consent while she was gone. When she returned home, she was surprised to find Appellant waiting for her, sitting in the dark. Appellant argued with her, bound her hands with her own shoe laces, and raped her. The State also offered evidence of the judgment and sentence in the subsequent criminal case showing Appellant's conviction for second degree burglary arising from this incident.

¶ 68 On appeal, counsel characterizes Appellant's objection to this evidence as a "laches-type" argument. Appellant reasons that since the State originally charged him with first degree rape based on these facts, but later agreed to the plea bargain in which Appellant suffered only a conviction of second degree burglary, the State is estopped from presenting evidence of the violent events that led to the charges. He argues the State's use of both the underlying violent assault and the subsequent plea-bargained conviction as evidence in a capital sentencing proceeding constitutes a second "bite at the apple," the State having waived its original opportunity to show proof of Appellant's guilt of the violent rape charge either by insisting upon a trial or guilty plea to that charge.

¶ 69 Our prior decisions indicate the State may prove the continuing threat aggravating circumstance "through the introduction of Judgments and Sentences showing a history of violent criminal behavior or through the introduction of additional evidence detailing the defendant's participation in other unrelated crimes, or both." *Malone v. State*, 1994 OK CR 43, ¶ 39, 876 P.2d 707, 717–18. We have long recognized that "unadjudicated offenses linked to a defendant in a capital case may be introduced to support the claim of future dangerousness." *Walker v. State*, 1986 OK CR 116, ¶ 46, 723 P.2d 273, 285. The State's decision to enter into a plea bargain with a defendant, or even dismiss charges based on the defendant's violent actions, has no bearing on whether the underlying violent conduct is admissible to prove future dangerousness. *Walker v. State*, 1992 OK CR 10, ¶ 20, 826 P.2d 1002, 1007 (State's subsequent dismissal of pending rape charge did not affect admissibility of underlying criminal acts offered to prove continuing threat aggravating circumstance); *Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir.1998)(testimony by victim that defendant committed unadjudicated sexual assault was

admissible to prove future dangerousness in capital sentencing, despite acquittal of a related gun possession charge connected to the assault).

¶ 70 A defendant's conviction or acquittal of a criminal charge neither alters the basic evidentiary facts of the underlying conduct, nor determines whether those facts may be offered to show his future dangerousness in a capital sentencing trial. Relevant evidence of a capital defendant's violent acts is admissible to show the existence of the continuing threat aggravating circumstance, whether those acts resulted in a conviction of the actual offense, some related or lesser included offense, or no conviction at all. Cf. *Smith v. State*, 2007 OK CR 16, ¶ 78, 157 P.3d 1155, 1178. Appellant's sexual assault of an ex-girlfriend in 2001, almost five years after the murder of Juli Busken, and his resulting second degree burglary conviction, were relevant to the jury's consideration of this aggravating circumstance. Proposition Six is denied.

¶ 71 Appellant argues in Proposition Seven that prosecutorial misconduct in the sentencing phase closing arguments renders his death sentence unreliable and unfair. We have long allowed counsel for the parties "a wide range of discussion and illustration" in closing argument. *Hamilton v. State*, 1944 OK CR 69, 79 Okla.Crim. 124, 135, 152 P.2d 291, 296. Counsel enjoy a "right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it." *Frederick v. State*, 2001 OK CR 34, ¶ 150, 37 P.3d 908, 946, *citing Brown v. State*, 1931 OK CR 464, 59 Okla.Crim. 307, 4 P.2d 129, 130 (Syllabus). We will reverse the judgment or modify the sentence "only where grossly improper and unwarranted argument affects a defendant's rights." *Ball v. State*, 2007 OK CR 42, ¶ 57, 173 P.3d 81, 95, *citing Howell v. State*, 2006 OK CR 28, ¶ 11, 138 P.3d 549, 556.

¶ 72 We review the challenged comments here only for plain error, due to the lack of any timely objection to the comments at trial. *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690. In the first comment, the prosecutor acknowledged the difficulty of the jury's job in sentencing, but emphasized that a death verdict could only be the result of twelve people unanimously returning a verdict. "Not one of you, no one individually will decide whether this man receives the death penalty or not." The prosecutor also asked the jury to not "let anyone, [defense counsel], don't let yourself, don't let anyone put that burden on your shoulder that it's your decision and your decision alone . . . The way our system works, 12 people have to return a verdict." Appellate counsel calls this comment "highly improper" and interprets it as "telling the jury that an individual sense of morality and mercy did not count and, indeed, would be contrary to law," which he characterizes as "patently false." We find no error in this argument. The prosecutor's statements were legally accurate.

¶ 73 Appellant's real complaint here is that the prosecutor's argument might have diminished a successful defense based on the fact that in Oklahoma, "a single juror has the power to prevent a death sentence in a given case." *Malone v. State*, 2007 OK CR 34, ¶ 73, 168 P.3d 185, 215. The prosecutor's argument certainly anticipated common capital defense rhetoric emphasizing the individual moral responsibility of each juror in voting to "kill" the defendant, in the hopes that one or more jurors will hold out against a death verdict favored by the others. The fact that a prosecutor anticipates a known defense argument and presents a counterpoint is not fundamentally unfair. A few pages later in this allegedly improper argument, we find the prosecutor telling jurors:

But, basically, you've got three choices. You've got one crime, murder in the first degree. The defendant has been found guilty of that, and you've got to decide, does that person receive death, does that person receive life in prison without the possibility of parole, or does Mr. Sanchez receive a term of life in prison with the possibility of parole. *Bottom line is if you don't want to do it, you don't have to. Read all these instructions. They're very important, none more than any of the others. But the bottom line is, you don't want to, you don't think it's appropriate, you don't have to. If you do think it's*

appropriate, then what Mr. Sitzman read in his opening, the Bill of Particulars, and what the Judge has talked about, the aggravating circumstances, become very important (emphasis added).

In the context of the entire argument and in light of other comments, these comments were not plain error.

¶ 74 In the second argument challenged on appeal, counsel claims the prosecutor improperly appealed to societal alarm "by urging the jury to imagine Mr. Sanchez embarking on a reign of terror with homemade weapons obtained within the prison walls." Appellate counsel states that "one can only imagine [the prosecutor's] theatrical presentation as he was quite obviously waving his props before the jury" when arguing that jurors should consider the possibility that Appellant could make and obtain weapons to hurt others in prison. We find the only evidence of any use of "props" occurs when the prosecutor refers to "these;" and from the context of the comment, he is holding before the jury the shoe laces used by Appellant to bind the woman he defiled and murdered. These were not "props," but rather evidence admitted in the case. In the same comment, the prosecutor makes mention of an antique letter opener to illustrate the use of ordinary objects to make "shanks" in the penitentiary. The record does not reflect whether he displayed a letter opener during his argument. The argument itself was a proper persuasive argument in support of the continuing threat aggravating circumstance, based on properly admitted evidence of Appellant's use of both ordinary items and dangerous weapons to subdue and attack innocent people. Again, we find no plain error.

¶ 75 Appellant next objects to several comments referring to Appellant and his actions as evil, and stating that some people come to symbolize evil by their infamous acts. The prosecutor stated at one point, "This is the handiwork—the evil handiwork of a heartless, merciless, pitiless, cruel, and depraved executioner." We see nothing unfair in these comments. Premeditated murder has been regarded as the pinnacle of evil in every age, and our law reflects this. Blackstone described willful murder as "a

crime at which human nature starts [i.e., recoils], and which is I believe punished almost universally throughout the world with death." 4 W. Blackstone, Commentaries 194. The Oklahoma Uniform Jury Instructions–Criminal define the "especially heinous, atrocious, or cruel," aggravating circumstance with reference to how a murderer's depravity and savagery shock the senses of humankind:

The term "heinous" means extremely wicked or shockingly evil; the term "atrocious" means outrageously wicked and vile; and the term "cruel" means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others.

Instruction No. 4–73, OUJI–CR(2d). We see an important distinction between a comment on the murderous human evil made relevant by the especially heinous, atrocious, or cruel aggravating circumstance, and the rhetorical indulgence of calling defendant a monster, a devil, or other inhuman entity. The comments here addressed the distinctly human evil involved in this case. We will not require counsel in such serious cases to address the jury with lifeless and timid recitations void of moral reflection or persuasive power. The wickedness of the murder itself, and the convicted murderer's indifference to, or enjoyment of, the suffering of others, were relevant, and the comments here were properly based upon the evidence. See, e.g., Hooper, at ¶¶ 55, 58, 947 P.2d at 1110–11 (argument that appellant was "an evil monster" trying to kill victim, and that his eyes reflected "stone cold evil" were proper comments based on evidence); Malicoat v. State, 2000 OK CR 1, ¶ 32, 992 P.2d 383, 401 (prosecutor's repeated references to defendant as a monster and evil were disfavored but not plain error). There is no plain error here.

¶ 76 Finally, Appellant claims that not only did the prosecutor "interject God in the proceedings ... he practically offered the jury a pastoral reassurance that, through divine forgiveness, the death penalty was approved by God." Counsel for Appellant reads the prosecutor's comments imaginatively, at the least. The prosecutor's comment here attempted to explain to jurors how he could ask "twelve good and honest people

... to do something that is against their human will, against their human nature," i.e. to forfeit, by their verdict, the life of a fellow human being. The prosecutor told jurors, "I know that what I ask of you, in my heart, I know my God will forgive me."

¶ 77 Our decisions have discouraged, if not entirely prohibited, state prosecutors from invoking divine precepts and Biblical references in support of the death penalty, either through evidence or argument. *See e.g.*, *Malone*, at ¶ 57, 168 P.3d at 209 (finding victim impact witness' "invocation of religious belief and obligation in the context of a capital sentencing recommendation is totally inappropriate"); *Washington v. State*, 1999 OK CR 22, ¶ 61, 989 P.2d 960, 978 (sentencing recommendation with biblical references contained in victim impact statement was improper); *Martinez v. State*, 1999 OK CR 33, ¶¶ 51–59, 984 P.2d 813, 827–829 (warning trial judges against the practice of offering prayer before trial because of strong potential for error); *Fontenot v. State*, 1994 OK CR 42, ¶ 59, 881 P.2d 69, 85 (closing argument during a criminal trial "should not include biblical references"). We need not decide whether the prosecutor's statement here would be error under these decisions, because the State did not interject divine reckoning into the sentencing proceeding, the defense did.

¶ 78 Defense counsel's sentencing stage closing argument shared a personal anecdote of how he "lost a lot of friends when I became a death penalty attorney" and why his work as a capital defense attorney was important: "Because there has to be fairness before we kill—before the Government kills in the United States of America." Defense counsel then argued that from his years of experience with capital defendants:

> [T]hose [prisoners] who suffer most are the ones that have to think about what they've done. That's why life without parole is such a serious and damning punishment ... they know as the clock ticks away, that they're going to meet their Maker. Everybody does.

* * *

Everyone in this courtroom is hurting, and everyone will leave here today, and will always hurt. [The prosecutor] indicated he had, I believe, a daughter that's now 18. I have a daughter that's 8 who's a ballerina. This is the last time I get to speak to you on behalf of Anthony Sanchez. I ask you to focus on fairness and mercy. I don't have much to offer you. But it is your decision, it's not the world's. I would make him think for as long as possible what he has done. He will meet his maker. But let that be on other people's or God's time.

¶ 79 The prosecutor's brief personal reflections about the forgiveness of God "were no more than an adversarial balance to Appellant's positions on religion." *Cole v. State*, 2007 OK CR 27, ¶ 57, 164 P.3d 1089, 1101. The argument did not, as Appellant hyperbolically contends, reassure jurors "that they, too, would be forgiven for imposing the death penalty;" nor did it "encourage the jury to follow biblical standards rather than the Court's instructions." *Powell v. State*, 2000 OK CR 5, ¶¶ 146–149, 995 P.2d 510, 538–539.

¶ 80 Our decisions on this subject serve to warn that a prosecutor who calls upon Heaven to witness the State's cause against the capital defendant will needlessly imperil the earthly judgment of the District Court. But the religious statements made by counsel for both parties here were brief and insignificant in view of the overwhelming evidence of aggravating circumstances, which clearly explain the jury's verdict. We find no prosecutorial misconduct warranting reversal or modification of the sentence. Proposition Seven is denied.

¶ 81 In Proposition Eight, Appellant argues the State's use of the continuing threat aggravating circumstance results in a cruel and unusual punishment. 21 O.S.1991, § 701.12(7);[3] U.S. Const. amend. VIII, XIV; Okla. Const. art II, § 9. This Court has repeatedly upheld the continuing threat aggravating circumstance, although Appellant claims we have done so "without any sub-

---

**3.** "Aggravating circumstances shall be: ... (7) the existence of a probability that the defendant will commit criminal acts of violence that would constitute a continuing threat to society."

stantive analysis." *Malone*, at ¶ 27, 876 P.2d at 715–16 (citing cases). According to Appellant, Oklahoma is one of only two States currently using a prediction of a convicted murderer's future dangerousness as an aggravating circumstance to determine eligibility for the death penalty. Using an "evolving standards of decency" analysis, *see generally*, *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), he argues the emerging consensus against this practice has rendered the State's use of the continuing threat aggravating circumstance offensive to contemporary moral standards. He also argues that our view of the constitutionality of the continuing threat aggravating circumstance is conceptually flawed by its reliance on *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and further undermined by the Supreme Court's decision in *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

¶ 82 Since *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court's Eighth Amendment jurisprudence has required that a State's capital sentencing scheme channel the sentencer's discretion by clear and objective standards which provide specific, detailed guidance and make the death sentencing process rationally reviewable on appeal. *Lewis v. Jeffers*, 497 U.S. 764, 774, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606 (1990). In a generation of cases decided since *Gregg*, the Supreme Court has articulated Eighth Amendment standards governing two discrete aspects of capital decision-making: the eligibility decision and the selection decision. *Tuilaepa v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). Before a defendant may be eligible for the death penalty, the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its procedural equivalent) under state law, during either the guilt or penalty phase of trial. *Tuilaepa*, 512 U.S. at 972, 114 S.Ct. at 2634, *citing inter alia*, *Lowenfield v. Phelps*, 484 U.S. 231, 244–246, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988). Factors for determining eligibility "almost of necessity require an answer [from the sentencer] to a question with a factual nexus to the crime *or the defendant*

so as to 'make rationally reviewable the process for imposing a sentence of death.'" *Tuilaepa*, 512 U.S. at 973, 114 S.Ct. at 2635, *quoting Arave v. Creech*, 507 U.S. 463, 471, 113 S.Ct. 1534, 1540, 123 L.Ed.2d 188. (1993)(emphasis added). A State's aggravating circumstance "is not unconstitutional if it has some 'common sense core of meaning . . . that criminal juries should be capable of understanding.'" *Tuilaepa*, 512 U.S. at 974, 114 S.Ct. at 2636, *quoting Jurek v. Texas*, 428 U.S. 262, 279, 96 S.Ct. at 2959, 49 L.Ed.2d 929 (White, J., concurring in judgment). Thus, an aggravating circumstance must meet two specific constitutional requirements: It cannot apply to every convicted murderer, but rather only a defined subclass of convicted murderers; and it cannot be unconstitutionally vague, in the sense that the language of the aggravating circumstance itself fails to provide "any guidance to the sentencer." *Arave*, 507 U.S. at 471, 113 S.Ct. at 1541–1542, *quoting Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990), *overruled on other grounds, Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Within these parameters, States may adopt eligibility and selection factors "that rely upon the jury, in its sound judgment, to exercise wide discretion." *Tuilaepa*, 512 U.S. at 974, 114 S.Ct. at 2636. In formulating the factors by which the class of convicted murders potentially subject to capital punishment is defined, "the States have considerable latitude in determining how to guide the sentencer's decision." *Tuilaepa*, 512 U.S. at 977, 114 S.Ct. at 2637.

¶ 83 The selection decision, where the sentencer determines whether an eligible murderer will actually suffer the penalty of death, must avoid arbitrariness in a different sense, by ensuring "individualized sentencing . . . expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Tuilaepa*, 512 U.S. at 973, 114 S.Ct. at 2635. The State's selection procedures must afford "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972, 114 S.Ct. at 2635, *quoting Zant*

*v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983). While the deliberative tasks of the sentencer in the eligibility and selection decisions are "somewhat contradictory," *see Romano v. Oklahoma*, 512 U.S. 1, 6, 114 S.Ct. 2004, 2009, 129 L.Ed.2d 1 (1994), the Supreme Court has emphasized a common requirement that eligibility and selection procedures must be "neutral and principled so as to guard against bias or caprice in the sentencing decision," *Tuilaepa*, 512 U.S. at 973, 114 S.Ct. at 2635, and must "minimize the risk of wholly arbitrary and capricious action." *Id.*, quoting *Gregg*, 428 U.S. at 189, 96 S.Ct. at 2932 (Opinion of Stewart, Powell, and Stevens, JJ.).

¶ 84 In a time before state police forces and penitentiaries, the need to proscribe dangerous persons from society was perhaps the strongest justification for taking the life of a criminal as punishment. Blackstone said:

> Death is ordered to be punished with death; not because one is equivalent to the other, for that would be expiation, not punishment ... But the reason upon which this sentence is grounded seems to be, that this is the highest penalty that man can inflict, and *tends most to the security of the world; by removing one murderer from the earth,* and setting a dreadful example *to deter others.*

4 W. BLACKSTONE, COMMENTARIES 13 (emphasis added). In 1793, a well-meaning New Hampshire minister gave the murderer Samuel Frost the illuminating, if not comforting, explanation that he must hang because his "life and liberty are dangerous to the peace of society, dangerous to the lives and liberties of your fellow citizens." S. BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 13 (Harvard University Press, 2002). The twin justifications of incapacitating the dangerous offender by execution, and deterring others of similar disposition in the process, remained inseparable objects of American capital punishment for a long time. *Id.* In our own times, the view undeniably persists among some American lawmakers, and a great many electors, that a convicted murderer's potential for future violence is a rele-

vant consideration in deciding whether the prisoner should suffer death.

¶ 85 This incapacitation rationale lies at the heart of the continuing threat aggravating circumstance. The circumstance itself is "phrased in conventional and understandable terms," *Tuilaepa*, 512 U.S. at 976, 114 S.Ct. at 2637, and presents the sentencer with the type of "forward-looking inquiry" that is a "permissible part of the sentencing process ..." *Id.* at 977, 114 S.Ct. at 2637, *citing Jurek*, 428 U.S. at 269, 96 S.Ct at 2955. We have held the statutory language of the continuing threat aggravating circumstance "directs the jury to examine the accused's conduct in the offense for which he was just convicted as well as *other relevant conduct relating to the safety of society as a whole.*" *Malone*, at ¶ 28, 876 P.2d at 716. (emphasis added). Questions from capital juries seeking clarification of this aggravating circumstance are relatively rare, suggesting that most jurors intuitively grasp the question presented by the aggravating circumstance as one that is familiar, if not so gravely important, in everyday life. We thus find support for our previous statements that this aggravating circumstance is "specific, not vague, and readily understandable." *Boltz v. State*, 1991 OK CR 1, ¶ 27, 806 P.2d 1117, 1125. With this factor, Oklahoma capital jurors are simply "asked to make a predictive judgment" about whether the defendant's potential for future violence presents a threat to human society, and if so, to consider that risk of violence in weighing all of the aggravating and mitigating factors in the selection aspect of its sentencing decision. *Jurek*, 428 U.S. at 269, 96 S.Ct. at 2955; Instruction No. 4–80, OUJI–CR(2d).

¶ 86 Like all human judgments, a jury's finding of a continuing threat or other aggravating circumstance may be in error. But as Justice Stewart said for the Supreme Court plurality over three decades ago in *Jurek*, "[t]he fact that such a determination is difficult, however, does not mean that it cannot be made." 428 U.S. at 274–75, 96 S.Ct. at 2957–58. Our criminal law in general, and capital punishment law in particular, account for the imperfections of human judgments in several ways, including the requirement that guilt, as well as aggravating circumstances,

be proved beyond a reasonable doubt. The capital jury instructions tell the sentencing jurors that unless they unanimously hold to a belief in the truth of at least one aggravating circumstance, they must not even *consider* the convicted murderer eligible for the death penalty. Instruction No. 4–76, OUJI–CR(2d). Oklahoma jurors are further instructed that a death penalty verdict is *never* required, even where the balance of aggravating and mitigating factors may fully justify it. Instruction No. 4–80, OUJI–CR(2d). The jury must also express its specific finding of any aggravating circumstance(s) on a special verdict form, Instruction No. 4–81, OUJI–CR(2d), providing "the further safeguard of meaningful appellate review ... to ensure that death sentences are not imposed capriciously or in a freakish manner." *Gregg,* 428 U.S. at 195, 96 S.Ct. at 2935; *see also, Malone,* 1994 OK CR 43, 876 P.2d 707; *Cudjo,* 1996 OK CR 43, 925 P.2d 895; and *Perry v. State,* 1995 OK CR 20, 893 P.2d 521 (cases overturning a jury's finding of the continuing threat aggravating circumstance on appeal due to insufficient evidence). We find these procedural safeguards give to the capital defendant additional protection from wholly arbitrary sentencing.

¶ 87 Appellant also argues that the Supreme Court's decision in *Penry v. Johnson,* 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*Penry II*), has undermined this Court's rationale for the constitutionality of the continuing threat aggravating circumstance, because our conclusion rested in part on the Supreme Court's opinion in *Jurek v. Texas,* supra. Under Texas law, a defendant's *eligibility* for the death penalty is determined by the conviction of a capital murder as defined by statute in the guilt stage of trial. The Texas sentencing procedure then uses the sentencer's answers to three special circumstances—one of which asks the sentencer to determine "whether there was a probability that defendant will commit criminal acts of violence that will constitute a continuing threat to society"—to determine whether the death penalty will be imposed. *Jurek,* 428 U.S. at 267–68, 96 S.Ct. at 2954.

¶ 88 In *Jurek,* the Supreme Court initially approved of Texas' use of the continuing threat to society factor in the selection aspect of its sentencing procedure, largely because it believed the Texas Court of Criminal Appeals would interpret the continuing threat factor "so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show." 428 U.S. at 272, 96 S.Ct. at 2956. Subsequent cases gave the Supreme Court reason to doubt if the Texas procedure actually guaranteed the individualized sentencing consideration required by *Gregg* and *Jurek. Cf. Franklin v. Lynaugh,* 487 U.S. 164, 175, 108 S.Ct. 2320, 2328, 101 L.Ed.2d 155 (1988) (plurality opinion); *id.,* at 185–186, 108 S.Ct. at 2333–2334 (O'Connor, J., concurring in judgment), and *id.,* at 199–200, 108 S.Ct. at 2340–2341 (Stevens, J., dissenting). The Supreme Court eventually held, in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)(*Penry* I), *overruled on other grounds, Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that sentencing phase jury instructions setting forth the special circumstances were not broad enough to allow a Texas jury to give effect to mitigating evidence that the defendant suffered brain damage and mental retardation, and thus violated the Eighth Amendment. *Penry I,* 492 U.S. at 322, 109 S.Ct. at 2948. On remand, the Texas trial court gave a supplemental instruction telling jurors they were authorized to consider mitigation evidence; and if the jury found the mitigating evidence warranted a life sentence, the jury should answer "NO" to one of the special circumstances. The supplemental instruction thus appeared to require jurors to answer one of the special circumstances "NO," in violation of the their oaths, even if the jury also believed the special circumstance had been proven beyond a reasonable doubt. In *Penry II,* the Supreme Court held this convoluted approach was an inadequate means for the jury to give a reasoned moral response to Penry's mitigating evidence, and again reversed the death sentence. *Penry II,* 532 U.S. at 799–804, 121 S.Ct. at 1922–24.

¶ 89 Appellant reads *Jurek* as narrowly approving the Texas Legislature's use of a future dangerousness question in the selec-

tion phase of death penalty decision-making, and *Penry II* as rendering the Supreme Court's earlier statements in *Jurek* obsolete. Our reliance on *Jurek* was wrong from the start, he argues, because of the significant difference between the purpose of eligibility and selection factors in Eighth Amendment jurisprudence. Indeed, he claims that the Supreme Court's "tacit approval of 'continuing threat' as a selection-stage factor *forecloses its use as an eligibility-stage aggravator.*" (emphasis added). Appellant here finds it significant that the Supreme Court has never held that a State's use of the continuing threat aggravating circumstance as an *eligibility* factor "is permissible under the Constitution." We do not find this fact at all remarkable for the reasons that follow.

 ¶ 90 Setting aside for the moment the distinctions between the Oklahoma and Texas sentencing schemes, the relevant Supreme Court cases indicate a State may just as readily direct the sentencer's attention to future dangerousness as a means of including or excluding the defendant from the class of offenders potentially subject to capital punishment (thus creating an *eligibility* factor); or, on the other hand, a State may direct the sentencer to consider future dangerousness in determining whether a particular *eligible* defendant should *actually* suffer death (thus making future dangerousness a *selection* factor). *Arave,* 507 U.S. at 471, 113 S.Ct. at 1540 (holding eligibility factor may properly require sentencer to answer a question with a factual nexus to the crime *or* the defendant); *California v. Ramos,* 463 U.S. 992, 1008, 103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171 (1983)(holding once the jury finds defendant within category of persons eligible for the death penalty, it is "free to consider a myriad of factors to determine whether death is the appropriate punishment").

¶ 91 The State of Oklahoma has followed the former course, while Texas, Virginia, and other States have followed their own unique versions of the latter, in full view of the Supreme Court for the more than three decades since *Gregg* and *Jurek.* Each of these approaches is consistent with the underlying rationale of incapacitation, and each can potentially avoid Eighth Amendment arbitrari-

ness. Appellant seems to say that Oklahoma's approach, conditioning *eligibility* for the death penalty on a finding of future dangerousness, partakes too much of an individualized determination and should be reserved for the jury's selection decision, or better yet, dispensed with altogether.

¶ 92 The Eighth Amendment prohibits a punishment which offends the "evolving standards of decency that mark the progress of a maturing society," even if the punishment was accepted when the Eighth Amendment was adopted. *Trop,* 356 U.S. at 101, 78 S.Ct. at 598–99 (denaturalization of citizen was cruel and unusual punishment for desertion in wartime). In those instances where the Supreme Court has invoked the "evolving standards of decency" to interdict the use of capital punishment, the Court has found either the severity of punishment grossly disproportionate to the crime, or the existence of some categorical *mitigating* factor which so diminishes the offender's culpability as to render the punishment cruel and unusual. *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (death penalty for rape was cruel and unusual); *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (death was cruel and unusual punishment for felony murder defendant who did not personally kill, attempt to kill, or intend that killing result); *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (execution of insane defendant would be cruel and unusual); *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (execution of prisoner with mental retardation offends contemporary standards of decency); *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (execution of person who was under 18 when capital crime was committed is cruel and unusual); *Kennedy v. Louisiana,* — U.S. —, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (death penalty for rape of a child was cruel and unusual).

¶ 93 We can find no case where the Supreme Court has directly applied the "evolving standards of decency" analysis— as opposed to the vagueness or overbreadth analysis used in *Tuilaepa* and earlier cases—to strike down a legislatively enacted

*aggravating* circumstance, which functions to narrow the application of the death penalty by identifying those convicted murderers eligible for capital punishment. Indeed, in the case of the continuing threat aggravating circumstance, such an analysis would seriously infringe on the Legislature's reasonable determination that death may be an appropriate punishment for a murderer who has shown "repeated disregard for the welfare, safety, personal integrity and human worth of others, and who seemingly cannot be deterred from continuing such conduct." *Coker*, 433 U.S. at 610, 97 S.Ct. at 2875 (Burger, C.J., joined by Rehnquist, J., dissenting); *Malone*, at ¶ 28, 876 P.2d at 716 (aggravating circumstance directs the jury to examine the current offense "as well as *other relevant conduct relating to the safety of society as a whole* ") (emphasis added). While the Supreme Court's capital jurisprudence has focused primarily on retribution and deterrence as justifications for capital punishment, the Court has acknowledged that incapacitation of a dangerous capital offender "is a legitimate consideration in a capital sentencing proceeding." *Spaziano v. Florida*, 468 U.S. 447, 461–62, 104 S.Ct. 3154, 3163, 82 L.Ed.2d 340, *citing Gregg*, 428 U.S. at 183, n. 28, 96 S.Ct. at 2930; *and Jurek*, 428 U.S. 262, 96 S.Ct. 2950 (Opinion of Stewart, Powell, and Stevens, JJ.).

¶ 94 We find the continuing threat aggravating circumstance is consistent with both traditional and modern standards of decency as reflected in the Supreme Court's decisions. The incapacitation rationale and the statutory language of the aggravating circumstance contain a common-sense core of meaning that criminal juries are capable of understanding. Future dangerousness is historically and logically relevant to whether a convicted murderer should suffer the extreme penalty. The continuing threat aggravating circumstance therefore narrows the class of convicted murderers eligible for the death penalty in a meaningful way, and when combined with other procedural safeguards in the Oklahoma statutes, sufficiently minimizes the risk of a wholly arbitrary death sentence for first degree murder. Proposition Eight is denied.

¶ 95 Appellant challenges the District Court's instruction on mitigating circumstances in Proposition Nine. He failed to lodge a timely objection to the instructions at trial, and thus waived all but plain error. *Simpson*, supra. Appellant concedes we recently upheld the uniform instruction on mitigating circumstances in *Harris v. State*, 2007 OK CR 28, ¶¶ 25–26, 164 P.3d 1103, 1113–14, finding it did not unconstitutionally limit the jury's ability to give effect to a defendant's mitigating evidence. He urges our reconsideration of the matter, pointing to the fact that we directed the Committee on Uniform Jury Instructions–Criminal to submit an alternate to the current instruction because the current language was being used in erroneous arguments by prosecutors. Plain error is error which goes to the foundation of the case or denies defendant a right essential to his defense. *Simpson*, at ¶ 12, 876 P.2d at 695. Based on our treatment of the issue in *Harris*, Appellant has not shown plain error in the District Court's use of the instruction. Proposition Nine requires no relief.

¶ 96 In Proposition Ten, Appellant claims violations of his right to assistance of counsel under the Sixth and Fourteenth Amendments and Article II, section 20 of the Oklahoma Constitution. Appellant argues defense counsel failed to "marshal the evidence" by all but conceding Appellant's guilt of rape and sodomy. He also argues counsel was ineffective in failing to object to improper arguments discussed in Proposition Seven, and in failing to discover and utilize additional mitigating evidence of Appellant's turbulent family background. In connection with this latter claim, he has filed a motion to supplement the appellate record and request for evidentiary hearing as permitted by Rule 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S.Supp.2008, Ch. 18, App.

¶ 97 We address these complaints applying the familiar test required by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This Court strongly presumes that counsel rendered reasonable professional assistance. Appellant must es-

tablish the contrary by showing: (1) that trial counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance. *Spears v. State*, 1995 OK CR 36, ¶ 54, 900 P.2d 431, 445. To determine whether counsel's performance was deficient, we ask whether the challenged act or omission was objectively reasonable under prevailing professional norms. In this inquiry, Appellant must show that counsel committed errors so serious that he was not functioning as the counsel guaranteed by the Constitution. *Browning v. State*, 2006 OK CR 8, ¶ 14, 134 P.3d 816, 830. The right to effective counsel is a means of enforcing the Constitution's guarantee of a fair and impartial trial, meaning a trial with a reliable result. Therefore, our overriding concern in judging counsel's trial performance is "whether counsel fulfilled the function of making the adversarial testing process work." *Hooks v. State*, 2001 OK CR 1, ¶ 54, 19 P.3d 294, 317.

 ¶ 98 Where the Appellant shows that counsel's representation was objectively unreasonable under prevailing professional norms, he must further show that he suffered prejudice as a result of counsel's errors. The Supreme Court in *Strickland* defined prejudice as a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial or sentencing would have been different. *Hooks, id., citing Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). We will reverse the judgment and sentence only where the record demonstrates counsel made unprofessional errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. If the record before us permits resolution of a claim of ineffectiveness on the ground that *Strickland's* prejudice prong has not been satisfied, we will ordinarily follow this course. *Phillips*, at ¶ 103, 989 P.2d at 1043.

¶ 99 Appellant's claim that counsel failed to "marshal the evidence" in closing argument by conceding Appellant's guilt of the rape charge is answered by our holding that the

evidence of rape was sufficient. We find defense counsel's tactical decision not to contest guilt of these crimes was a reasonable decision based on informed judgment and provides no basis for relief. Our cases have recognized that counsel's concession of certain facts may be appropriate "to establish credibility with the jury in the hope that at least one juror can be persuaded to vote for a sentence less than death in the penalty stage." *Abshier v. State*, 2001 OK CR 13, ¶ 60, 28 P.3d 579, 594, *overruled on other grounds, Jones v. State*, 2006 OK CR 17, 134 P.3d 150. Counsel's strategic decision not to contest guilt on these counts was not deficient performance under *Strickland*. Because we found no prosecutorial misconduct in Proposition Seven, counsel's failure to object to the challenged comments at trial provides no ground for a claim of ineffective assistance on appeal.

 ¶ 100 Appellant requests supplementation of the appellate record by remand for an evidentiary hearing in connection with his claim that counsel failed to discover and utilize mitigating evidence of his troubled family life.[4] He attaches to his motion to supplement affidavits from Appellant's step-mother and sister, both of whom testified as mitigation witnesses at trial. In their affidavits, these witnesses now claim that defense counsel and their investigators failed to properly interview them and advise them of the purpose of mitigation, which prevented them from disclosing additional information about Appellant's troubled childhood.

¶ 101 The materials submitted disclose that trial counsel personally met with Appellant's sister and step-mother two weeks before trial, at which time counsel and the witnesses reviewed a report of an earlier interview between the witnesses and a defense investigator. Both affiants state that mitigation was explained to them during the earlier interview with the defense investigator, but Appellant's sister now states that she "did not understand how the bad things in Anthony's life could help him;" while his step-mother states that "I do not feel that the

---

4. Appellant's Motion to Amend Application for Evidentiary Hearing on Sixth Amendment

Claims is **GRANTED** in connection with our consideration of this request.

significance of Anthony's troubled past and how it would have impacted the mitigation part of the trial was adequately explained to me." In sum, both witnesses claim they would have provided additional details on Appellant's troubled early life, his abusive father, and his drug-addicted and absent mother.

¶ 102 Under Rule 3.11(B)(3)(b)(i), *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S.Supp.2008, Ch. 18, App., this Court reviews the affidavits and evidentiary materials submitted by Appellant to determine whether they contain "sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." If the Court determines from the application that a strong possibility of ineffectiveness is shown, we will "remand the matter to the trial court for an evidentiary hearing, utilizing the adversarial process, and direct the trial court to make findings of fact and conclusions of law solely on the issues and evidence raised in the application." Rule 3.11(B)(3)(b)(ii). The evidentiary record thus created in the District Court may then be admitted as part of the record on appeal and considered in connection with Appellant's claims of ineffective counsel. Rule 3.11(B)(3) and (C).

¶ 103 After considering Appellant's claim in light of both the evidence offered at trial and materials submitted in support of his Rule 3.11 application, the Court finds that Appellant has not shown clear and convincing evidence suggesting a strong possibility that trial counsel was ineffective in the acts or omissions challenged here. The general subjects embraced in the supplemental affidavits of Appellant's family members were effectively presented to the jury during trial testimony. Although the witnesses now aver they could have provided additional details about the events and dynamics in Appellant's life, we find most of the additional facts now suggested could be readily inferred from the testimony given at trial. Appellant came from an unstable, broken home where alcoholism by his father, and the resulting drunken abuse of Appellant and his stepmother, were a corrosive part of family life. Appel-

lant was once a hurting and mistreated youngster who experienced betrayal, rejection, physical and emotional abuse and neglect. We also consider the evidence of other mitigating witnesses, which showed that through his relationships with caring educators and close friends, Appellant showed intelligence, personal charm, an ability to give and receive love, and a desire to protect women whom he respected. One after another, Appellant's mitigation witnesses expressed to jurors their utter disbelief that the person they thought they knew could be guilty of this heinous crime.

¶ 104 Nothing in the supplemental materials alters or amplifies in any compelling way the portrait which emerged from the testimony at trial. Appellant's defense at trial amounted to a denial that he killed Juli Busken, offering the theory that someone else was responsible for her murder. His arguments on appeal advance the same theory, at one point seemingly implicating his own father in the killing. Considering the record as a whole, we are unable to say that counsel's failure to discover and utilize the type of mitigation evidence identified in the supplemental materials was not part of a reasonable trial strategy. Indeed, the materials actually present no persuasive proof that trial counsel was unfamiliar with these facts. Counsel may have simply decided not to present the facts in the detail now considered more effective by appellate counsel. This record fails to establish clear and convincing evidence of a strong possibility that counsel was ineffective. We therefore deny Appellant's motion to supplement the record by remanding this case for an evidentiary hearing. Proposition Ten is denied.

¶ 105 Proposition Eleven argues the accumulation of errors in this case warrants reversal or modification of the sentence. We found error in the District Court's order requiring Appellant to wear restraints during the trial. Appellant has not shown that the error resulted in prejudice. We thus conclude the errors at trial had no cumulative prejudicial effect which rendered the trial unfair or the outcome unreliable. Proposition Eleven requires no relief.

¶ 106 This Court must determine in every capital case: (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of the aggravating circumstances. 21 O.S.2001, § 701.13(C). The jury found the murder was especially heinous, atrocious, or cruel; that Appellant committed the murder to avoid or prevent arrest or prosecution; and the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(4), (5), and (7). Appellant presented mitigating circumstances including a troubled family life, abandonment by his mother, abuse by his father, his good character qualities, and loving relationships with family, friends, and teachers. We have carefully reviewed the record of this trial and concluded the jury was not improperly influenced by passion, prejudice, or any other arbitrary factor in finding the existence of the aggravating circumstances beyond a reasonable doubt, and that the aggravating circumstances outweighed the mitigating evidence. The sentence of death is factually supported and appropriate.

### DECISION

¶ 107 The Judgment and Sentence of the District Court of Cleveland County is **AFFIRMED**. Pursuant to Rule 3.15, Rules of the Court of Criminal Appeals, Title 22, Ch. 18, App. (2009), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, P.J., A. JOHNSON, V.P.J., LUMPKIN and CHAPEL, JJ.: Concur.